UNITED STATES DISTRICT COURT                    NOT FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
-------------------------------- X
JOSE FELIX,

              *Pro se* Plaintiff,          **MEMORANDUM & ORDER**

   -against-                                   11-CV-3697 (KAM)

MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
-------------------------------- X
**MATSUMOTO, United States District Judge:**

       Pursuant to 42 U.S.C. § 405(g), *pro se* plaintiff Jose

Felix ("plaintiff") appeals the final decision of defendant

Michael Astrue, Commissioner of Social Security ("defendant"),

who denied plaintiff's application for Social Security

Disability ("SSD") and Supplemental Security Income ("SSI")

under Title II and Title XVI, respectively, of the Social

Security Act ("the Act").  Plaintiff contends that he is

disabled within the meaning of the Act and is thus entitled to

receive the aforementioned benefits.  Presently before the Court

is defendant's motion for judgment on the pleadings.  For the

reasons stated below, defendant's motion is granted.

**BACKGROUND**

**I.  Procedural History**

       Plaintiff applied for SSD and SSI on September 18,

2007, claiming he has been disabled since May 31, 2007.  (Tr.

1

105, 109.)[1]  Plaintiff alleged that he was disabled due to the
after-effects of rheumatic fever, which caused joint pain and
heart palpitations.  (Tr. 128.)  The Social Security
Administration (the "SSA") initially denied his application on
January 18, 2008.  (Tr. 69-72.)

Upon the SSA's denial of his application, plaintiff
requested an administrative hearing before an Administrative Law
Judge.  (Tr. 73-74.)  The SSA granted plaintiff's request for a
hearing, which was attended by plaintiff and his counsel on
February 18, 2009, before Administrative Law Judge Harvey
Feldmeier (the "ALJ").  (Tr. 75-76, 87-90.)  The ALJ issued a
decision on March 26, 2009, finding that the plaintiff was not
disabled.[2]  (Tr. 21-28.)  Specifically, the ALJ found that the
plaintiff had the Residual Functional Capacity ("RFC")[3] to
perform the full range of medium work.[4]  (Tr. 26-27.)  The ALJ

---

[1] "Tr." refers to the certified administrative record.  *See* ECF No.
15.

[2] The ALJ does not appear to have mentioned plaintiff's SSI claim.
Since the guidelines for evaluating disability for SSI and SSD claims are
similar, however, the ALJ's disability analysis applies to both the SSI and
SSD claims.  *Compare* 20 C.F.R. § 404.1520 *with* 20 C.F.R. § 416.920.

[3] Residual Functioning Capacity is the most a person is capable of
doing despite limitations resulting from physical and mental impairments. 20
C.F.R. § 404.1545(a).

[4] "Medium work involves lifting no more than 50 pounds at a time
with frequent lifting or carrying of objects weighing up to 25 pounds."  20
C.F.R. § 404.1567(c).  Additionally, "[a] full range of medium work requires
standing or walking, off and on, for a total of approximately 6 hours in an
8-hour workday . . . ."  Titles II and XVI:  Determining Capability to Do
Other Work — The Medical-Vocational Rules of Appendix 2, SSR No. 83-10, 1983
SSR LEXIS 30, at *15 (1983).

further found that, although there was a medically determinable impairment that could reasonably be expected to cause plaintiff's alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with an RFC determination that plaintiff could perform the full range of medium work. (*Id.*) The ALJ thus concluded that the plaintiff was able to perform his past work as a shipping clerk as the job is actually and generally performed, which included lifting 50 to 100 pounds or more with the assistance of coworkers and "mostly" using a hand truck while standing or walking. (Tr. 27.)

Plaintiff appealed the ALJ's decision to the Appeals Council on September 22, 2009. (Tr. 9.) The Appeals Council denied the appeal on June 8, 2011, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-4.) This appeal followed.

## II. Non-Medical Facts

Plaintiff was born on January 11, 1950. (Tr. 124.) Plaintiff's highest level of education is the ninth grade, but he has a general-equivalency diploma ("GED"), which he took in Spanish. (Tr. 41, 57.) Plaintiff can speak, but not read or write, English. (Tr. 127.)

Plaintiff's known work experience includes a position as a "general worker" at a fur business where he worked from 1977 to 1985, and shipping clerk positions at two fabric manufacturers. (Tr. 42, 145.) Most recently, plaintiff worked as a shipping clerk at Preview, a fabric manufacturer, from 2005 until 2007. (*Id.*)

Plaintiff has worked as a shipping clerk for approximately fourteen years. (Tr. 129.) Plaintiff claims that the job required him to unload boxes, lift rolls of fabric, walk for seven hours a day, stand for one hour, climb for six hours, grab big objects for three hours, and reach for eight hours in an eight-hour day. (*Id.*) In an undated Disability Report, plaintiff claimed that he frequently lifted fifty pounds or more, and that the heaviest weight he lifted was 100 pounds or more. (*Id.*) At the February 18, 2009 hearing, plaintiff testified that he had to lift 250 to 300 pounds with the help of a hand truck and his coworkers, and that he performed his tasks mostly standing. (Tr. 44.)

Plaintiff was fired from his last shipping clerk position on March 31, 2007. (Tr. 128.) In his Disability Report, plaintiff claimed that he was "fired due to a dispute, not related to any illness, with my employer." (*Id.*) At the February 18, 2009 hearing, however, plaintiff claimed that he

was fired by his employer after plaintiff "slowed down a lot" because his "body wasn't that great." (Tr. 43.)

Plaintiff lives alone in a second-floor apartment. (Tr. 35-36, 134.) He climbs about ten steps to reach his apartment and is able to travel on the subway alone. (Tr. 36, 39.) Plaintiff reported going shopping at the grocery store below his apartment three times a month. (Tr. 39, 138.) In a Function Report questionnaire from October 17, 2007, plaintiff wrote that he cleans his home, takes walks, "go[es] to different agencies to seek financial help" on a usual day, and tries to go out everyday, and either walks or uses public transportation. (Tr. 135, 137.) Plaintiff also claimed that he could not stand for long periods due to joint pain, that it is difficult to dress himself, and that his joints cramp occasionally while shaving. (Tr. 135-36.) Otherwise, plaintiff said he is able to bathe and use the toilet independently. (*Id.*) Plaintiff prepares three meals a day for himself and performs all household chores, though he claimed doing chores is "difficult and painful." (Tr. 136-37.) Finally, plaintiff said he enjoys watching television and sports in parks and that he goes to a social club to play dominoes two or three times a week, though his illness has caused him to stay at home more often. (Tr. 138-39.)

Plaintiff claimed that he could walk ten blocks before needing to stop and rest for ten to fifteen minutes. (Tr. 140.) Plaintiff also asserted that he feels pain in his hands, legs, back, arms, and shoulders, but that at times he "mostly fe[lt] the pain from the waist down." (Tr. 142.) At the February 18, 2009 hearing, plaintiff testified that he could only walk two blocks or stand for ten minutes before having to rest due to leg pain. (Tr. 52.)

Additionally, plaintiff testified that he had received unemployment insurance benefits from March 2007 until January 2009. (Tr. 39, 59-60.) Plaintiff testified that while he was receiving unemployment insurance benefits, he had certified once every two weeks that he was ready, willing, and able to work. (Tr. 40-41.) At the hearing, however, plaintiff claimed that he only made the certifications because he "need[ed] the money" and thought he could "do something light" in his home. (Tr. 40.) Subsequently, plaintiff testified that he never tried to find work between March 2007 and January 2009 because his leg pain prevented him from taking the subway, in conflict with his prior representation that he was able to take the subway independently. (Tr. 37, 60.)

In a medical record from the Long Island College Hospital dated November 16, 2007, plaintiff admitted that he engaged in "substance abuse" – later identified as cocaine use

(Tr. 300, 309) – by taking one gram of cocaine twice a week for twenty-nine years, though he had quit for one month  (Tr. 303). When the ALJ questioned plaintiff about whether his heart problems were caused by cocaine use, as indicated in his medical records, plaintiff answered that he had used cocaine only once. (Tr. 47.)  Plaintiff later corrected his testimony, claiming he had only used cocaine "once in a blue moon" since 1976, and had used marijuana "once in a blue moon" in order to help him move around.  (Tr. 48.)

**III. Medical Facts**

Plaintiff has presented medical records dating back to October 2007.[5]  (Tr. 172-79.)  His date-last-insured is December 31, 2011.  (Tr. 124.)

    **A.   Plaintiff's Testimony Regarding His Symptoms**

At plaintiff's February 18, 2009 hearing, plaintiff testified that he (1) had pain in his leg that he rated as a seven on a pain scale of zero to ten (ten being the most painful), (2) could only lift seven pounds, and (3) experienced heart palpitations due to his prior rheumatic fever in 1970 and

---

[5] At the February 18, 2009 hearing, plaintiff testified that Dr. Michael Jones had been plaintiff's primary care doctor until 2006, but presented no evidence or indication that medical records from Dr. Jones were relevant to his disability claim.  (Tr. 45-46.)  As plaintiff claims that his disability arose on May 31, 2007, the ALJ had no duty to seek medical records from Dr. Jones, which would have predated plaintiff's alleged disability onset date.  *See* 20 C.F.R. § 404.1512(d)(2)("If you say that your disability began less than 12 months before you filed your application, we will develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier.").

a family history of heart problems. (Tr. 45, 57-60.) To plaintiff's knowledge, his mother, sister, father, and grandmother all died of cardiac problems. (Tr. 59.) Additionally, plaintiff claimed he was unable to close the thumb and index finger on his right (dominant) hand, where he was hit by a stray bullet in 1985 and stabbed in 1995 during an attempted robbery. (Tr. 53-54.) Finally, plaintiff testified that cold weather, rain, and snow caused pain in his stomach and legs. (Tr. 62.)

## B. Consultative Examiner's Report

On October 18, 2007, plaintiff was examined by Dr. Rahel Eyassu, a consultative examiner. (Tr. 172-75.) Plaintiff reported taking non-prescription Advil and Motrin pain medications at the time. (Tr. 172.) Dr. Eyassu found that plaintiff had a history of a bullet wound in his right forearm, status post-surgery for a partial tendon laceration and a radial digital nerve laceration, and flexion deformity of his right index finger since 1982. (*Id.*) Dr. Eyassu also reported that plaintiff was in "no acute distress" and needed no help changing, rising from a chair, or getting on and off the exam table, though he had a slow gait. (Tr. 173.) Further, Dr. Eyassu wrote that plaintiff's lumbar spine had full rotary movement bilaterally, and full rotary movement of shoulders, elbows, forearms, wrists, hips, knees, and ankles. (Tr. 174.) Dr.

Eyassu also found that plaintiff's strength in his upper and lower extremities and his grip strength in his hands were "5/5." (*Id.*)

Dr. Eyassu, however, found that plaintiff had an irregular heart rhythm and diagnosed plaintiff with tachycardia, hypertension, right index flexion deformity, and rheumatic heart disease, by history. (Tr. 173-74.) Apart from the tachycardia, for which Dr. Eyassu gave an unknown prognosis, plaintiff received a "fair" prognosis on all of Dr. Eyassu's diagnoses, with changes in medication and diet. (Tr. 174.) Dr. Eyassu also found that plaintiff was restricted to "mild to moderate exertion." (*Id.*) After finding plaintiff's irregular heart beat, Dr. Eyassu sent plaintiff to the Long Island College Hospital ("LICH") emergency room for his heart palpitation and uncontrolled hypertension. (Tr. 174, 180.)

### C. Long Island College Hospital Medical Records

Plaintiff was admitted to LICH on October 18, 2007, complaining of heart palpitations. (Tr. 180.)[6] During his first visit, plaintiff underwent an electrocardiogram and was found to have paroxysmal atrial fibrillation. (Tr. 180.) On October 22, 2007, plaintiff underwent an exercise stress test that showed a heart rate that was 90% of the age predicted heart rate, a left ventricular ejection fraction of 51%, and "good wall motion" of the left ventricle. (Tr. 223.) The doctor found left ventricular hypertrophy, but no exercise induced ischemia. (*Id.*) Plaintiff was given aspirin, metoprolol (which the attending physician noted had "controlled" his high blood pressure), and Coumadin, an anticoagulant. (Tr. 178, 192.) Plaintiff was discharged on October 23, 2007. (Tr. 180.)

On October 24, 2007, the attending physician at LICH noted that plaintiff had New York Heart Association Class II symptoms, a category that includes slight limitation of activity due to cardiac disease and feelings of fatigue, palpitation, dyspnea, or anginal pain during ordinary physical activity. (Tr. 317.) Plaintiff was prescribed hydrochlorothiazide to treat his high blood pressure. (*Id.*)

---

[6] During his visits to LICH, plaintiff was treated by various attending physicians. (*See* Tr. 180, 191-320.) Among others, plaintiff saw Drs. A. Moussa, H. Patel, Myo Win, and Vinay Pai. Most of the LICH records, however, contain illegible signatures by the attending physician or indicate plaintiff was seen by an "unknown doctor." (*See* Tr. 191-320.) Thus, the court will not refer to findings by specific doctors at LICH.

On October 31, 2007, plaintiff was prescribed Zocor for his high cholesterol. (Tr. 316).

On November 16, 2007, the treating physician at LICH found that plaintiff's heart rate and rhythm were normal, and that he had "5/5" strength in his extremities. (Tr. 304.) Plaintiff also reported that he had "no active complaints" and "deni[ed]" having musculoskeletal symptoms. (Tr. 302-03.) As discussed above, plaintiff admitted to taking one gram of cocaine twice a week for twenty-nine years, though he had quit for a month, as of November 16, 2007. (Tr. 303.) The attending physician increased plaintiff's metoprolol and Coumadin dosages and counseled plaintiff on his diet. (Tr. 305.)

On November 23, 2007, the LICH physician noted that plaintiff reported having anxiety related to staying clean from cocaine. (Tr. 300.)

On February 15, 2008, plaintiff returned to LICH to refill his Coumadin prescription and reported "no other complaint." (Tr. 297.)

On February 28, 2008, plaintiff was seen at LICH for mildly symptomatic varicosities in his leg. (Tr. 313.) The attending physician noted that plaintiff was "asymptomatic" and prescribed compression socks. (*Id.*)

On December 30, 2008, the LICH attending physician noted that plaintiff's heart condition was "most likely cocaine

induced," and had "now improved." (Tr. 309.) His ejection fraction was measured at 55%, within the normal range. (*Id.*) The physician also found no signs of atrial fibrillation, but the physician did mention that the plaintiff's activity was "limited due to pain in knees or joints." (*Id.*)

### D. Non-examining Physician

On January 14, 2008, Dr. D. Dorff was asked by the New York State Office of Temporary and Disability Assistance to review Dr. Eyassu's report and plaintiff's LICH records from October 18-23, 2007. (Tr. 189.) Dr. Dorff found that plaintiff appeared to be poorly compliant regarding his medication, and that his impairment limited him to lifting or carrying twenty-five to fifty pounds and standing or walking for six hours. (*Id.*)

### E. Field Office Interviewer

On September 18, 2007, J. Tirschwell, from the Social Security Field office, conducted a face-to-face interview with plaintiff, and noted that plaintiff had difficulty understanding, answering, sitting, standing, walking, and writing. (Tr. 125.)

### DISCUSSION

In his motion for judgment on the pleadings, the Commissioner argues that the ALJ correctly determined that plaintiff was not disabled because plaintiff has the RFC to perform the full range of medium work and is capable of

performing his past relevant work as a shipping clerk.  (*See* ECF
No. 12, Memorandum of Law in Support of the Defendant's Motion
for Judgment on the Pleadings ("Def. Mem.") at 13-19.)
Plaintiff filed a one-sentence opposition stating that he is
"currently . . . under the care of a psychiatrist . . . for over
a year to deal with [his] anxiety and stress" due to his
"inability to sleep and work."  (ECF No. 13, Plaintiff's
Affidavit/Affirmation in Opposition to Defendant's Motion ("Pl.
Aff.") at 1.)[7]  Finally, defendant filed a reply brief arguing
that plaintiff's recent treatment for anxiety - which is at
least one-and-a-half years after the Commissioner's final
decision - is not relevant to the time period at issue in this
case and that there is no evidence or even an allegation of any
mental impairment in the administrative record.  (*See* ECF No. 14,
Reply Memorandum of Law in Further Support of Defendant's Motion
for Judgment on the Pleadings ("Def. Reply") at 1-2.)

## IV.  Standard of Review

        "A district court may set aside the [ALJ's]
determination that a claimant is not disabled only if the
factual findings are not supported by substantial evidence or if
the decision is based on legal error."  *Burgess v. Astrue*, 537

---

[7] In Social Security Insurance appeals, the court must liberally
construe documents filed by *pro se* plaintiffs. *See Thibodeau v. Comm'r of Soc.
Sec.*, 339 F. App'x 62, 63 (2d Cir. 2009) (summary order) (quoting *Boykin v.
KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) ("A document filed *pro se* is to be
liberally construed . . . ." (internal quotation marks omitted))).

F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted).

"Substantial evidence is 'more than a mere scintilla.  It means

such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Halloran v. Barnhart*, 362

F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402

U.S. 389, 401 (1971)).  An evaluation of the "substantiality of

evidence must also include that which detracts from its weight."

*Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.

1988).

If there is substantial evidence in the record to

support the Commissioner's factual findings, those findings are

conclusive and must be upheld. *See* 42 U.S.C. § 405(g).  Moreover,

the reviewing court "may not substitute [its] own judgment for

that of the [Commissioner], even if [the court] might

justifiably have reached a different result upon a de novo

review."  *Priel v. Astrue*, 453 F. App'x 84, 86 (2d Cir. 2011)

(summary order) (quoting *Valente v. Sec'y of Health and Human

Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)) (internal quotation

marks omitted).

**V.   Determining Whether a Claimant is Disabled**

A claimant is disabled under the Social Security Act

when he is unable "to engage in any substantial gainful activity

by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity" that the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work [that] exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

The SSA has promulgated a five-step sequential analysis to determine whether the claimant's condition meets the Act's definition of disability:

> [I]f the Commissioner determines (1) that the claimant is not working,[8] (2) that he has a 'severe impairment,'[9] (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability,[10] and (4) that the claimant is not capable of continuing in his prior type of work,[11] the Commissioner must find

---

[8] Under the first step, if the claimant is currently engaged in "substantial gainful activity," 20 C.F.R. § 404.1520(a)(4)(i), the claimant is not disabled, regardless of the claimant's medical condition, *id.* § 404.1520(b).

[9] Under the second step, the claimant must have "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities" in order to have a "severe impairment." 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1520(a)(4)(ii).

[10] Under the third step, if the claimant has an impairment that meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is *per se* disabled. 20 C.F.R. § 404.1520(d); *see also* 20 C.F.R. § 404.1520(a)(4)(iii).

[11] Under the fourth step, the claimant is not disabled if he or she can still do his or her "past relevant work." 20 C.F.R. § 404.1520(f); *see also* 20 C.F.R. § 404.1520(a)(4)(iv).

him disabled if (5) there is not another type of work that claimant can do.[12]

*Burgess*, 537 F.3d at 120 (alteration in original) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

During this five-step process, "[t]he Commissioner is required to 'consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity' to establish eligibility for Social Security benefits." *Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (summary order) (alteration in original) (quoting 20 C.F.R. § 404.1523). Further, "if the Commissioner do[es] find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process." *Id.* (alteration in original) (internal quotation marks omitted).

In steps one through four of the sequential five-step framework, the claimant bears the "general burden of proving that he or she has a disability within the meaning of the Act." *Burgess*, 537 F.3d at 128. In step five, the burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that in light of the claimant's RFC, age, education, and

---

[12] Under the fifth step, the claimant may still be considered not disabled if he or she "can make an adjustment to other work" available in the national economy. 20 C.F.R. § 404.1520(g); *see also* 20 C.F.R. § 404.1520(a)(4)(v)

work experience, the claimant is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

**VI.  The ALJ's Disability Determination**

Using the five-step sequential process to determine whether a plaintiff is disabled, as mandated by 20 C.F.R. § 404.1520(a)(4), the ALJ determined at step one that plaintiff has not engaged in substantial gainful activity since his alleged disability onset date.  (Tr. 26.)  At step two, the ALJ found that plaintiff had severe impairments, including joint pain and a post-rheumatic fever status.  (*Id.*)  At step three, the ALJ found that plaintiff lacked an impairment or combination of impairments that meet or medically equal one of the listed impairments in Appendix 1 of the regulations that would conclusively require a disability determination.  (*Id.*)  At step four, the ALJ found that plaintiff was not disabled, concluding that he had the RFC to perform the full range of medium work.  (Tr. 26-27.)  The ALJ then found that plaintiff was capable of performing his past relevant work as a shipping clerk.  (Tr. 27.)

In deciding that plaintiff had the RFC to perform medium work, the ALJ cited plaintiff's medical records from LICH.  (Tr. 27)  The ALJ noted from the LICH records, specifically a radiology report of a cardiac stress test (Tr.

223), that plaintiff's heart had a "good ejection fraction" of
51%, "good wall motion of the left ventricle," and a normal
cardiac assessment, after treatment. (*Id.*)  Although the ALJ
considered Dr. Eyassu's diagnosis of tachycardia and plaintiff's
mild to moderate exertion restrictions (Tr. 174), the ALJ
ultimately concluded from the LICH records that plaintiff's
heart problems were "temporary" and, as noted in the LICH
cardiology notes, "related to cocaine use."  (Tr. 27, 311.)

     Furthermore, the ALJ acknowledged that plaintiff's
medically determinable impairments could cause his symptoms, but
found that plaintiff's statements concerning the intensity,
persistence, and limiting effects of his symptoms were not
credible to the extent that they are inconsistent with an RFC
determination that plaintiff could perform the full range of
medium work.  (Tr. 27.)

**VII. Analysis**

    **A.**    **The ALJ's Determination of Plaintiff's RFC**

     The ALJ's determination that plaintiff has the RFC to
perform medium work was supported by substantial evidence.  Dr.
Eyassu noted that plaintiff's strength in his extremities and
hands was "5/5" and that he had "full rotary movement" of his
lumbar spine, shoulders, elbows, forearms, wrists, hips, knees,
and ankles.  (Tr. 174.)  Further, Dr. Eyassu found that
plaintiff took only over-the-counter medications, such as Advil

and Motrin, to control his joint pain prior to October 18, 2007. (Tr. 172.) Moreover, neither Dr. Eyassu nor the LICH physicians prescribed medications specifically for plaintiff's joint pain; the LICH physicians only prescribed medications for plaintiff's cardiac and cholesterol issues. (*See* Tr. 178, 192, 317, 316.)

Although Dr. Eyassu diagnosed plaintiff with tachycardia and with restrictions on "mild to moderate exertion" in October 2007 (Tr. 174), the records from LICH indicate that plaintiff's irregular heart rate and rhythm were temporary and responsive to treatment a month later. (*See, e.g.*, Tr. 223, 304, 309.) Indeed, in November 2007, the treating physician at LICH found that plaintiff's heart rate and rhythm were normal and noted that plaintiff reported "no active complaints." (Tr. 302, 304.) The November 2007 records also indicate that plaintiff had stopped using cocaine. (Tr. 300, 303.) In February 2008, plaintiff again reported "no other complaint," apart from needing his prescription refilled, and plaintiff's varicosities in his leg were "asymptomatic." (Tr. 297, 313.) In December 2008, the treating physician at LICH noted that plaintiff's heart condition was "now improved" and found no signs of atrial fibrillation. (Tr. 309.) Moreover, Dr. Dorff's review of Dr. Eyassu's report and the LICH records indicate that plaintiff is able to lift twenty-five to fifty pounds and stand or walk for six hours (Tr. 189), which is within the strength

requirement of medium work.  *See* 20 C.F.R. § 404.1567(c).  Thus,

substantial evidence in plaintiff's medical record support a

finding that plaintiff's joint pain did not prevent him from

performing medium work and that plaintiff's

cardiac problems improved with treatment and the cessation of

cocaine use.[13]

      Finally, plaintiff's own claims about his daily

activities support the ALJ's finding that plaintiff could

perform medium work.  Plaintiff lives alone in his second floor

walk-up apartment, where he performs all household chores.  (Tr.

136-37.)  Plaintiff claimed that on a typical day, he takes

walks, cleans, and visits different agencies to seek financial

help.  (Tr. 135.)  Plaintiff also goes shopping for himself

three times a month and visits a social club to play dominoes at

least twice a week.  (Tr. 138-39.)  At the hearing, plaintiff

testified that he is able to travel on the subway alone and

climb ten steps to reach his second-floor apartment.  (Tr. 36-37,

---

[13]  The ALJ concluded, based on the LICH records (Tr. 311), that
plaintiff's heart problems were "temporary and related to cocaine use" (Tr.
27).  Pursuant to 42 U.S.C. § 423(d)(2)(C), "[a]n individual shall not be
considered to be disabled . . . if alcoholism or drug addiction would (but
for this subparagraph) be a contributing factor material to the
Commissioner's determination that the individual is disabled."  *See also* 20
C.F.R. § 404.1535(b)(1) ("The key factor we will examine in determining
whether drug addiction or alcoholism is a contributing factor material to the
determination of disability is whether we would still find you disabled if
you stopped using drugs or alcohol.").  Although the ALJ did not make any
specific findings regarding whether plaintiff's cocaine use was a
"contributing factor material to the determination of disability," *id.*, it
appears from the LICH medical record that plaintiff's cocaine use contributed
to his heart problems (Tr. 311).

39.)  These daily activities are consistent with a finding that
plaintiff could perform medium work.[14]

**B.    The ALJ's Evaluation of Plaintiff's Credibility**

A claimant's statements of pain or other subjective
symptoms cannot alone serve as conclusive evidence of disability.
*Genier v. Astrue*, 606 F.3d 46, 49 (2d. Cir. 2010) (citing 20
C.F.R. § 1529(a)).  In evaluating a claimant's assertions of his
subjective symptoms, the ALJ must follow a two-step analysis.
*Id.*  First, the ALJ determines if a claimant has a "medically
determinable impairment that could reasonably be expected to
produce the symptoms alleged."  *Id.* (citing 20 C.F.R.
§ 404.1529(b)).  Second, if an impairment of that nature is
present, the ALJ must then determine "the extent to which [the

---

[14] In plaintiff's brief to the Appeals Council, plaintiff's former
counsel argued that the ALJ erred in finding that plaintiff had the RFC to
perform medium work.  (Tr. 163.)  Plaintiff maintained that there was "no
medical evidence of record" to support the ALJ's finding, and cited Dr.
Eyassu's diagnoses of plaintiff's "history of a bullet wound in the right
forearm," "status post surgery for a partial tendon laceration and radial
digital nerve laceration," "flexion deformity of his right index finger,"
mild to medium work restriction, and tachycardia.  (Tr. 163-64.)  Further,
plaintiff argued that the Disability Analyst who conducted a face-to-face
interview with plaintiff on September 18, 2007 noted that plaintiff had
difficulty "understanding, answering, sitting, standing, walking and writing."
(Tr. 164.)  As discussed above, however, there is evidence in the record that
plaintiff was capable of and performed medium work after he sustained the
previous shooting and stabbing injuries in 1985 and 1995 respectively
described by Dr. Eyassu.  Indeed, substantial medical evidence supports
defendant's finding that during the relevant period, plaintiff was capable of
performing medium work.  Such evidence includes (1) Dr. Eyassu's and the LICH
physicians' findings that plaintiff had "5/5" strength in his extremities and
hands (Tr. 174, 304), (2) plaintiff's multiple statements to LICH physicians
that he had no complaints (Tr. 297, 302, 308), (3) an LICH medical record
indicating that plaintiff's tachycardia was "now improved" after treatment
(Tr. 309), and (4) Dr. Dorff's finding that plaintiff's impairment limited
him to lifting or carrying twenty-five to fifty pounds and standing or
walking for six hours - within the range of "medium work" (Tr. 189).  *See* 20
C.F.R. § 404.1567(c); SSR No. 83-10, 1983 SSR LEXIS 30, at *15.

claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" in the administrative record. *Id.* (alteration in original) (quoting 20 C.F.R. § 404.1529(a)) (internal quotation marks omitted).

If the plaintiff offers statements about pain or other symptoms that are not substantiated by the objective medical evidence, "the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (summary order) (citing 20 C.F.R. § 404.1529(c)(3)). In making this credibility determination, the ALJ must consider seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken; (5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *see also Meadors*, 370 F. App'x at 184 n.1.

The ALJ, however, is not required to discuss all seven factors in his decision as long as the decision includes precise reasoning, is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the claimant's statements and the reasons for that weight. *Snyder v. Barnhart*,

323 F. Supp. 2d 542, 546-47 & n.5 (S.D.N.Y. 2004) (upholding an
ALJ's credibility assessment where the ALJ incorporated the
internal consistency of the plaintiff's symptom statements and
their consistency with his treatment history into his decision,
even though the ALJ did not explicitly discuss all seven
credibility factors). "Because the ALJ has the benefit of
directly observing a claimant's demeanor and other indicia of
credibility," his decision to discredit subjective testimony is
"entitled to deference" and may not be disturbed on review if
his disability determination is supported by substantial
evidence. *Brown v. Astrue*, No. CV-08-3653, 2010 U.S. Dist.
Lexis 62348, at *19 (E.D.N.Y. June 22, 2010)(citing *Tejada v.
Apfel*, 167 F.3d 770, 776 (2d Cir. 1999); *Aponte v. Sec'y of
Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).

        Additionally, if the evidence in the record permits a
reviewing authority to "glean the rationale of an ALJ's
decision," the ALJ is not required to mention every item of
testimony or to explain why he considered particular evidence
unpersuasive or insufficient to lead him to a conclusion of
disability. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir.
1983) (affirming an ALJ's finding that plaintiff was not
disabled, where the ALJ wrote in his opinion that he had
"considered all of the evidence presented," even though the ALJ
did not discuss the plaintiff's wife's testimony regarding his

illness); *accord Ahern v. Astrue*, No. 09-CV-5543, 2011 U.S. Dist. LEXIS 30745, at *18 (E.D.N.Y. Mar. 24, 2011) (finding that the ALJ "was not obligated to explicitly reconcile each piece of evidence he considered in his decision as long as it is clear, as is the case here, that he weighed all the evidence of plaintiff's symptoms, both subjective and objective" (citing *Mongeur*, 722 F.2d at 1040)). More recently, the Second Circuit held that in considering the claimant's submissions, the ALJ need not provide a "specific analysis" of those submissions. *Brault v. Soc. Sec. Admin., Comm'r*, No. 11-2121-cv, 2012 U.S. App. LEXIS 13393, at *11-12, (2d Cir. June 29, 2012)("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998))).

Following the two-step analysis for evaluating a claimant's assertions of his subjective symptoms, the ALJ first found that plaintiff's prior rheumatic fever and joint pain were medically determinable impairments that could reasonably be expected to cause the alleged symptoms. (Tr. 26.) At step two, however, the ALJ found that plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible. (Tr. 27.) Even though the ALJ did not explicitly consider all seven factors in his evaluation of plaintiff's credibility, the ALJ's decision included precise

reasoning, was supported by evidence in the case record, and clearly indicated the ALJ did not find plaintiff's statements to be credible to the extent they were inconsistent with an RFC determination that plaintiff could perform the full range of medium work.

Similar to *Snyder*, 323 F. Supp. 2d at 547, the ALJ's credibility determination incorporated considerations of the internal consistency of the plaintiff's statements and their consistency with the treatment record as a whole. (Tr. 27.) First, the ALJ noted that plaintiff's allegations of pain were "inconsistent" with his treatment record at LICH, including the fact that he was discharged from LICH with no instructions regarding exertion limitations, that his heart was found to have "good ejection fraction" and "good wall motion," and that his cardiac assessment was "within normal limits." (Tr. 27; *see also* Tr. 180, 223, 304.) The ALJ also recognized and reconciled contrary evidence in Dr. Eyassu's report. (Tr. 27.) Citing Dr. Eyassu's diagnosis of tachycardia, the ALJ noted that plaintiff had a "temporary exacerbation of his condition in October 2007," but that the subsequent LICH records from October 18, 2007 through December 30, 2008 indicated that his heart problems were "temporary and related to cocaine use." (Tr. 27; *see also* Tr. 223, 280, 309.) As discussed above, the LICH treating records demonstrate that plaintiff's tachycardia improved after he was

first admitted to the hospital following Dr. Eyassu's examination. (*See, e.g.,* Tr. 223, 304, 309.)

Regarding plaintiff's allegations of joint pain, as discussed previously, Dr. Eyassu found that plaintiff had full rotary movement in his spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles, and both Dr. Eyassu and an LICH record from November 2007 indicate that plaintiff had "5/5" strength in his extremities and hands. (Tr. 174, 304.) Additionally, Dr. Eyassu noted that plaintiff took only over-the-counter medications, such as Advil and Motrin, to control his joint pain prior to October 18, 2007 (Tr. 172), and Dr. Eyassu did not diagnose any joint conditions, apart from plaintiff's inability to flex his right index finger, due to his prior injuries.[15] (*Id.*) Plaintiff also told LICH physicians multiple times that he had no complaints. (Tr. 297, 302, 308.) Although the LICH records make one mention of knee or joint pain (Tr. 309), there is no indication that plaintiff sought treatment for his pain, and he once denied having musculoskeletal symptoms (Tr. 302). Accordingly, given the general lack of any objective medical evidence supporting plaintiff's allegations of joint pain or of complaints of joint pain in the record, the ALJ's finding that plaintiff's

---

[15] Plaintiff's hand injury, however, is not the primary focus of his alleged joint pain, which plaintiff claims he "mostly" feels "from the waist down," in addition to his "hands, legs, back and arms, [and] shoulders." (Tr. 142.)

subjective complaints of joint pain were inconsistent with his treatment record is supported by substantial evidence.

Second, the ALJ reasoned that plaintiff's statements concerning his symptoms were not consistent with his own testimony at the February 18, 2009 hearing, in which he admitted to having certified he was ready, willing, and able to work during the period for which he is claiming disability benefits. (Tr. 27; *see also* Tr. 39-41.) The ALJ found that plaintiff tried to mitigate his certifications by claiming he had only made them in order to receive unemployment benefits, and that plaintiff's "response raised the additional problem of trying to determine the accuracy of his testimony in support of his attempts to get still another set of government benefits. It was more consistent to find that his original certifications had been truthful." (Tr. 27.)

At the February 18, 2009 hearing, although plaintiff did not explicitly state that he certified he was ready, willing, and able to work solely to receive unemployment benefits (*see* Tr. 39-41), his testimony regarding the unemployment benefits did contain internal inconsistencies. For instance, plaintiff first testified under oath that he did not make the certifications; next, plaintiff corrected his testimony, admitting that he made the certification because he believed he could "do something light" in his house; finally, when the ALJ informed him that he

was required to certify that he was able to perform his past job, plaintiff answered that he "need[ed] the money."  (Tr. 40.) Plaintiff also testified that, during the period he collected unemployment benefits, he never tried to find work because of his pain.  (Tr. 60.)

Courts in the Second Circuit have held that an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that he was ready, willing, and able to work during the time period for which he claims disability benefits as adverse factors in the ALJ's credibility determination.  *See House v. Comm'r of Soc. Sec.*, No. 09-CV-913, 2012 U.S. Dist. Lexis 40845, at *33 (N.D.N.Y. Feb. 29, 2012) (Report and Recommendation) (listing the fact that plaintiff collected unemployment benefits and certified that she was ready, willing, and able to work during the period of alleged disability as support for the ALJ's adverse credibility determination), *adopted by* 2012 U.S. Dist. LEXIS 40839 (N.D.N.Y Mar. 23, 2012); *Desmond v. Schweiker*, 545 F. Supp. 1250, 1253 (E.D.N.Y. 1982) (finding that, in making an adverse credibility determination, an ALJ was entitled to consider the fact that plaintiff had certified she was ready, willing, and able to work during the time for which she was claiming disability benefits); *accord Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (concluding that the ALJ properly listed plaintiff's receipt of

unemployment benefits during the period for which he claimed disability benefits as a factor adversely impacting plaintiff's credibility).  Accordingly, the ALJ here properly considered the inconsistency between plaintiff's seeking of unemployment benefits by certifying that he is ready, willing, and able to work and his claims of disability for the same time period as one of many factors relevant to assessing the credibility of plaintiff's allegations of subjective pain.

Third, plaintiff's testimony regarding his past cocaine use was also inconsistent.  At the hearing, plaintiff first claimed that he only used cocaine "once," but then corrected himself, claiming that he used cocaine "once in a blue moon."  (Tr. 48.)  Plaintiff's testimony also contradicted medical history records from the LICH, in which one physician noted that plaintiff had taken one gram of cocaine twice a week for twenty-nine years (Tr. 303), and another physician noted that plaintiff suffered anxiety from stopping his cocaine use (Tr. 300), thus suggesting that plaintiff had used cocaine more frequently and recently than he stated in his testimony.

Similarly, plaintiff's explanation as to why he left his last shipping clerk position in 2007 is inconsistent.  In his Disability Report, plaintiff claimed he was fired after a dispute with his employer, which was "not related to any illness."  (Tr. 128.)  At the February 18, 2009 hearing, however,

plaintiff testified that he was fired because his "body wasn't that great" and he "slowed down a lot." (Tr. 43.)

Finally, as discussed previously, plaintiff's daily activities are inconsistent with his subjective allegations of pain. Plaintiff stated that he can walk ten blocks before needing to rest for ten to fifteen minutes (Tr. 140), goes shopping three times a month (Tr. 138), prepares three to four daily meals (Tr. 136), and performs all household chores (Tr. 137). Moreover, plaintiff's testimony regarding his ability to take the subway varied during the course of his testimony. He first testified that he was able to travel alone on the subway (Tr. 37), but later said that he did not look for employment because he was unable to ride on the subway due to his pain (Tr. 60).

Based on these inconsistencies in the record, and the fact that plaintiff's allegations of pain are not substantiated by any objective medical evidence, prior complaints of joint pain, or plaintiff's daily activities, the ALJ's adverse credibility determination is supported by substantial evidence in the record, which has permitted the court to "glean the rationale of [the] ALJ's decision." *Mongeur*, 722 F.2d at 1040.

**C.    The ALJ's Evaluation of Plaintiff's Past Relevant Work as Medium Work**

At step four in the analysis, the ALJ must consider whether the plaintiff has the RFC to perform his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  In order to survive step four, "the claimant has the burden to show an inability to return to [his or] her previous specific job *and* an inability to perform [his or] her past relevant work generally.  This inquiry requires separate evaluations of the previous specific job and the job as it is generally performed."  *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (citations omitted).  Here, the ALJ found that plaintiff could perform his past work as a shipping clerk "as actually and generally performed."  (Tr. 27.)

In determining whether a claimant can perform his or her past relevant work as generally performed, "[t]he inquiry . . . is not whether a claimant is able to perform the duties of [his or] her previous job, but whether the claimant is able to perform the duties associated with [his or] her previous 'type' of work."  *Halloran*, 362 F.3d at 33 (2d Cir. 2004) (finding that plaintiff could perform her prior work as a computer operator because she could perform the sedentary work required of her "previous 'type' of work," even though she could not sit continuously for eight hours as specifically required by her previous job (citing *Jock v. Harris*, 651 F.2d 133, 135 (2d

Cir. 1981) (finding that plaintiff could perform her past relevant work as a cashier because she could perform the sedentary work required of cashier positions that could be performed in the sitting position, even though her previous cashier position at a supermarket required extended periods of standing))).

The *Dictionary of Occupational Titles* ("DOT") is used to describe jobs "as they are generally performed," *Jasinki*, 341 F.3d at 185, and the Commissioner is permitted to take administrative notice of the DOT, *see* 20 C.F.R. § 404.1566(d)(1); *see also Petrie v. Astrue*, 412 F. App'x 401, 409-10 (2d Cir. 2011) (summary order) (finding that an ALJ can rely on a DOT job classification to characterize plaintiff's past work as "unskilled" without consulting a vocational expert).  The DOT classifies the position of "Shipping Clerk" as "Medium Work," which requires exerting twenty to fifty pounds of force occasionally and/or ten to twenty-five pounds frequently.  DOT, § 222.387-050 (2001), *available at* LEXIS; *cf*. 20 C.F.R. § 404.1567(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."); SSR No. 83-10, 1983 SSR LEXIS 30, at *15 ("A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday . . . .").

The DOT, therefore, establishes that the plaintiff's past work as a shipping clerk, as generally performed, is medium work. *See Jasinski*, 341 F.3d at 185; *Jock*, 651 F.2d at 135. Accordingly, the ALJ properly found that plaintiff's ability to perform medium work enables him to perform his past relevant work as a shipping clerk as generally performed, and the plaintiff failed to satisfy his burden of proving that he cannot perform his past relevant work as a shipping clerk.[16] *See Halloran*, 362 F.3d at 33; *Jock*, 651 F.2d at 135.

### D. The Plaintiff's Presentation of New Evidence

Liberally construed, plaintiff's affidavit may be read to present an argument that new evidence may be a ground for remanding the ALJ's decision. *See Thibodeau v. Comm'r of Soc. Sec.*, 339 F. App'x 62, 63 (2d Cir. 2009).

---

[16] Because the ALJ's finding that plaintiff could perform his past relevant work as a shipping clerk as generally performed is sufficient to negate a finding of disability at step four, it is not necessary for the court to determine whether plaintiff could perform his past relevant work as actually performed. *See Jasinski*, 341 F.3d at 185; *Halloran*, 362 F.3d at 33; *Jock*, 651 F.2d at 135; *Britton v. Apfel*, No. 98 Civ. 2530, 2000 U.S. Dist. LEXIS 8536, at *13-14 (S.D.N.Y. June 19, 2000) (denying plaintiff's claim at step four after finding that the ALJ correctly relied on the DOT's classification of a correction officer position as requiring medium work in determining that plaintiff could perform his past relevant work as a correction officer as generally performed). The court nonetheless also concludes that the ALJ's finding that plaintiff could perform his past position as a shipping clerk as actually performed is supported by substantial evidence. Plaintiff testified that, in his past position as a shipping clerk, he lifted 250 to 300 pounds with the help of a hand truck and two of his coworkers and that his job involved mostly standing. (Tr. 44) Considering that plaintiff used a hand truck and the help of two other employees to reduce the level of his own individual exertion when lifting heavy objects, plaintiff's testimony regarding his past work is consistent with the ALJ's finding that his past shipping clerk position as actually performed was medium work. (Tr. 27.)

A court may order the Commissioner to consider additional evidence only upon a showing that "(1) the proffered evidence is new and not merely cumulative of what is already on the record, (2) that the evidence is material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative, and (3) that there is good cause for the failure to present the evidence earlier." *Batista v. Astrue*, No. 08-CV-2136, 2010 U.S. Dist. LEXIS 103119, at *30 (E.D.N.Y Sept. 29, 2010) (internal quotation marks omitted); *see also* 42 U.S.C.S. § 405(g); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).

With respect to the second requirement of materiality, new evidence is only material if it is relevant to the plaintiff's condition during the period for which benefits were denied, spanning from the alleged onset date through the ALJ's decision. *Tirado*, 842 F.2d at 597. Materiality also requires a "reasonable possibility" that new evidence would have influenced the Commissioner to decide the plaintiff's application differently. *Id.*; *see Abreu-Mercedes v. Chater*, 928 F. Supp. 386, 391 (S.D.N.Y. 1996) (finding that new evidence that the plaintiff had undergone corrective surgery on his left shoulder after the ALJ's decision was not material, since the new surgery did not provide new information about plaintiff's illness prior to the ALJ's decision and would not have influenced the ALJ's

decision).  Specifically, new evidence indicating only that the plaintiff's condition has worsened since the ALJ's decision does not meet the materiality requirement.  *See Allen-Porter v. Astrue*, No. 10 Civ. 1695, 2011 U.S. Dist. LEXIS 142729, at *19-20 (S.D.N.Y. Dec. 9, 2011) (finding immaterial a letter from plaintiff's psychologist stating that plaintiff's mental illness had worsened after the ALJ's decision); *Camacho v. Comm'r*, No. 04-CV-2006, 2005 U.S. Dist. LEXIS 31833, at *10-11 (E.D.N.Y. Dec. 6, 2005) (declining to remand for consideration of new evidence indicating that plaintiff's HIV infection worsened after the ALJ decision).

Plaintiff argues in his affidavit that he is "currently . . . under the care of a psychiatrist . . . for over a year to deal with [his] anxiety and stress" due to his "inability to sleep and work."  (Pl. Aff. at 1.)  Plaintiff's new evidence that he is being treated by a psychiatrist, however, does not satisfy the materiality requirement for the admission of new evidence because it is not relevant to the plaintiff's condition between May 31, 2007, the alleged onset date of plaintiff's disability, and March 26, 2009, the date of the ALJ's decision.  (Tr. 21, 105.)  Plaintiff alleges only that he has seen a psychiatrist for "over a year," dating from January 20, 2012.  (Pl. Aff. at 1.)  Even assuming plaintiff has been seeing his psychiatrist for two years, beginning in January 2010,

this period of treatment would have occurred after the ALJ's March 26, 2009 decision. (Tr. 24.)

Furthermore, plaintiff's medical records from the period for which his benefits were denied do not suggest any mental disability. Neither Dr. Eyassu's report nor the LICH records indicate that plaintiff's mental condition was a source of his alleged disability. The LICH records only contain one mention of anxiety, which was related to staying clean from cocaine and not to plaintiff's inability to work or sleep. (Tr. 300.)

Any records from plaintiff's psychiatrist, then, would not speak to plaintiff's ability to work between May 31, 2007 and the date of the ALJ's decision. At best, plaintiff's new psychiatric evidence would establish a worsening of his condition after the ALJ's decision. As *Allen-Porter*, 2011 U.S. Dist. LEXIS 142729, at *19-20, and *Camacho*, 2005 U.S. Dist. LEXIS 31833, at *10-11, suggest, however, plaintiff's showing that his condition worsened after the ALJ decision is not a sufficient ground for remand. Therefore, it appears that plaintiff's only recourse for his alleged worsened condition is to file a new application for disability benefits, assuming he can establish disability prior to December 31, 2011, his date-last-insured as determined by the ALJ. (Tr. 124.) *See Allen-Porter*, 2011 U.S. Dist. LEXIS 142729, at *20 (plaintiff may

reapply for benefits with evidence of a worsened condition);
*Camacho*, 2005 U.S. Dist. LEXIS 31833, at *11 ("[Claimant] is, of
course, free to reapply for benefits based on conditions that
have developed or worsened since the ALJ rendered his decision"
(citing *Velasquez v. Barnhart*, No. 03 CV 6448, 2004 U.S. Dist.
LEXIS 15144, at *22 (S.D.N.Y. Aug. 4, 2004) ("If [plaintiff's]
condition has indeed worsened since the ALJ issued his
opinion . . . she is encouraged to reapply for benefits."))).

## CONCLUSION

For the reasons set forth above, the Commissioner's
decision is affirmed and defendant's motion for judgment on the
pleadings is granted. Defendant shall serve a copy of this
Memorandum and Order on the *pro se* plaintiff and file a
certificate of service via ECF by July 25, 2012. The Clerk of
the Court is respectfully requested to enter judgment in favor
of the defendant and close this case.

**SO ORDERED**

Dated:     Brooklyn, New York
           July 24, 2012

                                        */s/*
                                        **KIYO A. MATSUMOTO**
                                        United States District Judge
                                        Eastern District of New York